FILED

2007 Dec-04  AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

JOHN BOX,                        )
                               )
             Plaintiff    )
                               )
      vs.                     )        Case No.  3:06-cv-01347-HGD
                               )
NEW YORK TIMES COMPANY,   )
                               )
            Defendant   )

## MEMORANDUM OPINION

The above-entitled civil action is before the court on the motion for summary judgment filed by defendant (Doc. #9) and the motion for summary judgment filed by plaintiff (Doc. #12).  These parties have consented to the exercise of jurisdiction by the magistrate judge, pursuant to 28 U.S.C. § 636(c) and LR 73.2.

Plaintiff, John Box, has filed suit against The New York Times Company (The Times) because he claims that he was wrongfully denied long term disability (LTD) benefits under The New York Times Company Long Term Disability Plan (the LTD Plan) by the Times ERISA Management Committee (EMC).  The parties have filed briefs and evidentiary submissions, and the matter is now ready for disposition.

### John Box's Motion for Summary Judgment

Plaintiff has requested an award of benefits pursuant to 29 U.S.C. § 1132(a)(1)(b), and an award of reasonable attorney fees and costs pursuant to

29 U.S.C. § 1132(g).  He asserts that the denial of his application for LTD benefits is due to be reviewed under the heightened arbitrary and capricious standard, as set out below.  Plaintiff contends that, under this standard, the denial of benefits is due to be set aside.

### The New York Times Company's Motion for Summary Judgment

Defendant asserts that the denial of John Box's application and subsequent appeals for LTD benefits under the LTD Plan by The Times was reasonable and supported by substantial evidence.  The Times contends that, even if the applicable standard to be used in determining whether its denial of benefits was proper is the heightened arbitrary and capricious standard, its decision was proper.

### The LTD Plan

It is undisputed that, at all relevant times, The Times maintained an LTD Plan that was an "employee benefit plan" as that term is defined by § 3(1) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1002(1).  A participant is deemed "Totally Disabled" and qualified for benefits during the first 24 months of an employee's "Total Disability" (after a five-month qualifying period before long term disability benefits begin) if the participant "is unable, because of illness or injury, to perform all of the duties of his occupation."  (LTD Plan § 2.20(a)).

After the first 24 months, an employee is deemed "Totally Disabled" and eligible for benefits if the participant is "unable, because of injury or illness, to

engage in any gainful occupation or profession for which he is reasonably qualified or reasonably could become qualified by education, experience, capability or training." (LTD Plan, § 2.20(b)).

The determination of whether an individual meets the definition of "Total Disability" is made by the Claim Administrator (MetLife) and the EMC. (LTD Plan, § 2.20). The burden is on the applicant to submit to EMC and/or the appropriate body, any proof that may be required as evidence of the applicant's total disability or the continuation of such total disability. (LTD Plan § 9.01).

The LTD Plan expressly grants the EMC the discretionary authority to interpret and apply the LTD Plan. Specifically, it provides:

> § 6.03 Administrative Procedures. The [EMC] shall have sole authority and discretion to administer and construe the terms of the [LTD] Plan, subject to the applicable requirements of law. Without limiting the generality of the foregoing, the [EMC] shall have complete discretionary authority to carry out the following powers and duties:
>
> (a) to make and enforce such rules and regulations as it deems necessary or proper for the efficient administration of the [LTD] Plan;
>
> (b) to interpret the [LTD] Plan, its interpretation thereof to be final and conclusive on all persons claiming benefits under the [LTD] Plan;
>
> (c) to decide all questions concerning the [LTD] Plan, including without limitations, any issues of fact, and eligibility of any person to participate in, and receive benefits under the [LTD] Plan; and

> (d)  to  appoint  such  agents,  counsel,  accountants,
> consultants and other persons as may be required to assist
> in administering the [LTD] Plan.

(LTD Plan, § 6.03).

An employee seeking LTD benefits must file a claim in writing with the Claim Administrator, MetLife.  (LTD Plan, § 7.01).  If the claim is denied by MetLife, the participant may appeal the denial to MetLife by written application (LTD Plan, § 7.04).  If MetLife denies this first appeal, the participant may make a second appeal to the EMC whose determination is final and conclusive.  (LTD Plan, §§ 6.03, 7.05).

The EMC, which administers and oversees the LTD Plan, is appointed by the Compensation Committee of the Board of Directors of The New York Times.  (LTD Plan, § 6.01).  According to Robert Nusspickel, Director of Corporate Benefits, benefits under the LTD Plan are paid out of the general assets of The New York Times Company.  (Nusspickel Depo. at 11).

**Factual Background**

John Box was an employee of The Times Daily, a regional newspaper published in Florence, Alabama, and owned by The Times.  At the time plaintiff stopped working for The Times Daily, he was a Home Circulation/Delivery Manager.  (Complaint, ¶ 6).  In 2004, after many years of employment with The Times Daily, Box stopped working due to claimed disabilities, including Gitelman's Syndrome,

persistent right flank pain, overwhelming fatigue, difficulty concentrating and blurred vision.  (Plaintiff's Ex. 1 at D 114, MetLife Personal Profile of John Box).

On November 20, 2004, Box submitted an application for LTD benefits under the LTD Plan to MetLife.  (Plaintiff's Ex. 1 at D 124-26, MetLife Disability Claim of John Box).  In addition to his Claim and Personal Profile, Box submitted medical records from his treating physicians, Dr. Rajesh Boorgu, Dr. Suzanne Bergman and Dr. Edward Crockett, and from Eliza Memorial Hospital.  (*Id.* at D 127-59).

On March 11, 2004, Dr. Boorgu noted that Box was referred to him by Dr. Crockett for chronic hypokalemia.[1]  (*Id.* at D 127). Upon examination on that date, Dr. Boorgu noted:

> Patient is a young white male in no acute distress.  WT is 173.  BP 110/72.  Temperature is normal.  PULSE: 80. HEENT:  Negative.  Neck no bruits, no thyromegaly, no lymphadenopathy.  Chest movements are equal.  Lungs Clinically Clear.  Heart:  Regular.  Ejection murmur, Grade I present. ABDOMEN: Soft with no organomegaly. Extremities reveal no edema.

---

[1] Dorland's Illustrated Medical Dictionary defines hypokalemia as:

> abnormally low potassium concentration in the blood; it may result from potassium loss by renal secretion or by the gastrointestinal route, as by neuromuscular disorders ranging from weakness to paralysis, by electrocardiographic abnormalities (depression of the T wave and elevation of the U wave), by renal disease, and by gastrointestinal disorders.

Dorland's Illustrated Medical Dictionary, 27th Ed. (1988).

(*Id.* at D 128).  Dr. Boorgu stated that his initial impression, among others, was that plaintiff suffered from chronic hypokalemia, chronic depression and anxiety.  (*Id.*).

Two weeks later, Box returned to Dr. Boorgu for a follow-up visit.  At that time, Dr. Boorgu noted that plaintiff had a proteinuria of 1.55 grams and a urinary K (potassium) of 96.5 mEq and was suffering from chronic hypokalemia.  He was prescribed certain medications for these conditions.  (*Id.* at D 131).

On April 27, 2004, Box made another visit to Dr. Boorgu for further evaluation of his chronic hypokalemia.  At that time, Box told Dr. Boorgu that he had not noticed any significant difference with the additional medication he had been prescribed.  Box advised Dr. Boorgu that he was continuing to have episodes of severe fatigue and weakness, although he also reported that on some days he felt a little better.  All of Box's vital signs appeared to be normal.   Dr. Boorgu's notes stated that, given his long history of hypokalemia, a diagnosis of Bartter's syndrome needed to be considered.  Dr. Boorgu stated that he intended to do more lab work in order to provide Box with further therapeutic recommendations.  Box was scheduled to return in two weeks.  (*Id.* at D 132).

Box returned to see Dr. Boorgu on May 20, 2004.  Dr. Boorgu's notes reflected that, since Box's previous visit, he had done further evaluation.  He noted that there had been some improvement in Box's excretions of potassium, which had gone down from 97 mEq to 66 mEq.  At the same time, his proteinuria improved from 1.55 grams to .16 grams.  (*Id.*).  According to Dr. Boorgu, Box's low potassium was most

consistent with Gitelman's syndrome.  He noted that the medication he prescribed appeared to be working and that Box was feeling considerably better with decreased losses of potassium.  He prescribed a continuing regimen of medication as therapy for Box. (*Id.*).

On June 16, 2004, Box was again examined by Dr. Boorgu.  Dr. Boorgu noted that Box was improving a little bit with his Gitelman's syndrome.  His potassium level was noted to be 3.6.  He noted that, since Box's last visit to his office, he had seen Dr. Bergman in Birmingham, who had rendered a second opinion.  According to Dr. Boorgu, Dr. Bergman agreed with Dr. Boorgu's diagnosis but increased certain medications.  On this date, Dr. Boorgu stated that Box had been improving with his Gitelman's syndrome, but on the day of the examination complained of significant fatigue, polyuria and confusion, similar to his original presentation several months before. (*Id.* at D 133).

Dr. Boorgu concluded that Box was suffering from an exacerbation of his Gitelman's syndrome.  He increased some of Box's medication and added others.  Box was scheduled for a follow-up visit with Dr. Boorgu in six weeks.  (*Id.*).

Box returned for another checkup with Dr. Boorgu on June 30, 2004.  He noted that Box was now complaining of increasing right flank pain with some radiation down his upper right quadrant and into the loin.  He again diagnosed Box with hypokalemia consistent with an exacerbated Gitelman's syndrome.  He also noted the

new onset of right flank pain consistent with a kidney stone.[2]  He indicated that he intended to perform CT imaging to evaluate this.

Dr. Boorgu's notes reflect that on July 1, 2004, he prescribed Darvocet for the flank pain and noted that the CT was negative.[3]  On July 8, 2004, he also increased Box's dosage of potassium medication from 20 mEq per day to 100 mEq per day.  (*Id.* at D 134).

On August 2, 2004, Dr. Boorgu noted that Box was complaining of pain in his right rib cage region.  He also was still complaining of significant malaise and generally not feeling well.  Dr. Boorgu's notes reflect that Box's hypokalemia and Gitelman's syndrome were now reasonably well controlled with high doses of potassium supplementation.  He described Box's right flank pain as being without clear etiology.  (*Id.* at D 135).

On August 24, 2004, Box returned to Dr. Bergman at the Kirklin Clinic at UAB Hospital in Birmingham.  Her notes stated that he was returning for a visit after having initially been seen in May 2004 with symptoms, including hypokalemia, suggesting Gitelman's syndrome.  She noted that he asserted that since his previous visit he had experienced little improvement in his symptoms, which included various muscle aches and pains along with joint pains.  (*Id.* at D 151).

---

[2]  The medical records reflect that Box has a past history of kidney stones (nephrolithiasis).

[3]  The results of the CT imaging are found in the records submitted from Helen Keller Hospital in Sheffield, Alabama.  (Plaintiff's Ex.1 at D 155).

On this date, he complained of right flank pain, blurry vision, and decreased concentration such that he had become unable to drive. According to Box, he had various muscle aches in his arms and legs, but he had no difficulty in rising from a chair or brushing his hair. He described joint pain but denied inflammation or redness and stated that he only suffered about 20 minutes of morning stiffness. (*Id.*).

Dr. Bergman noted that Box's vital signs were normal and described him as a pleasant, well-nourished, well-developed white male in no apparent distress but whose affect was somewhat depressed. (*Id.*). His potassium level was 3.6, which Dr. Bergman described as "adequate." (*Id.* at D 152).

In her assessment, Dr. Bergman stated that, while plaintiff's potassium level appeared to be adequate, he was still suffering from somatic conditions. She stated that she was unsure if it was related to depression or another disorder such as fibromyalgia. She also expressed doubt that all of his symptoms were consistent with features of Gitelman's syndrome. She noted that he had lately maintained a constant potassium level in the upper 3s under his current treatment regimen. She concluded that she did not have any further treatment options to offer him and that she was referring him to Dr. David Warnock for additional potential treatments for his symptoms. (*Id.*).

Finally, Dr. Bergman noted that Box's potassium level and a low magnesium level had been treated and that he was also on a non-steroidal anti-inflammatory drug. She stated that she was "really unclear as to why he is having some problems thinking

and why his joints hurt all over." Despite his complaints, she found that his physical examination was "essentially normal." (*Id.*).

Box returned to Dr. Boorgu on September 13, 2004, for another follow-up visit. Box advised him that he was continuing to have significant pain in his right rib cage. According to Dr. Boorgu, since his previous visit, in addition to seeing Dr. Bergman, Box also saw his regular physician, Dr. Crockett, who referred him to a pain clinic. He received an injection of Lidocaine and steroids along his right rib cage which did not help the pain. He also used Lidocaine patches which Dr. Boorgu stated had apparently been somewhat helpful. Box also advised that while getting the steroids, he did note some overall improvement. (*Id.* at D 136).

According to Dr. Boorgu, Box's hypokalemia was being adequately controlled at that time by high doses of potassium, magnesium oxide, and other medications. He noted that Box's depression was relatively stable and he still considered the right flank pain to be of unclear etiology. (*Id.*).

On October 21, 2004, Box again was seen by Dr. Boorgu. Box continued to complain that he was having significant problems with fatigue, lack of energy, muscle cramps, and generalized malaise. Dr. Boorgu noted that Box was still doing reasonably well in controlling his hypokalemia, that he was still using pain patches for his flank pain, and that Box had relatively low blood pressure (85/50) which may have been causing his fatigue. (*Id.* at D 137).

On November 20, 2004, plaintiff applied for LTD benefits under The Times LTD Plan. (*Id.* at D 124-26). This application was first reviewed by MetLife. In its review, MetLife noted that plaintiff's physicians reported that his hypokalemia due to Gitelman's Syndrome was adequately controlled with supplements, all of his physical exam findings were within normal limits, and the symptoms of fatigue, malaise, and pain were based solely on plaintiff's subjective reports. (*Id.* at D 93).

On February 28, 2005, Kim Malone, Case Manager for MetLife, wrote plaintiff and advised him that his claim for benefits had been denied. (*Id.* at D 68-69). She stated that the medical documentation submitted did not support a severity of condition or provide evidence of a functional impairment that would preclude him from performing the duties of his occupation. The letter suggested that he provide MetLife with medical documentation that indicated his level of functionality and how his condition was preventing him from working.

On March 31, 2005, plaintiff appealed to MetLife to review its decision. In his appeal, plaintiff submitted a letter from Dr. Boorgu dated March 24, 2004, in support of his appeal. In this letter, Dr. Boorgu stated that plaintiff suffers from depression anxiety and gastroesophageal reflux disease. Dr. Boorgu's initial work-up reflected that his hypokalemia was related to Gitelman's syndrome which can lead to severe fatigue, lack of energy, muscle aches, generalized malaise and weakness. He further stated that Gitelman's syndrome is a debilitating disease which leads to chronic wasting of electrolytes and can be activity limiting. He also noted that Gitelman's

syndrome is a lifelong disease with no known cure, though some treatment options are available. He stated that Mr. Box was suffering from many of the problems associated with Gitelman's disease, including difficulty in maintaining concentration (making management decisions difficult), flank pain (limiting his capacity to sit for extended periods) and severe fatigue. (*Id.* at D 264). Dr. Boorgu also stated in the letter that high stress conditions exacerbate plaintiff's fatigue and weakness and that he cannot lift more than 25 pounds because this exacerbated his flank pain. (*Id.* at D 165).

Upon receipt of plaintiff's appeal, MetLife referred the entire administrative file to NMR, a third-party medical review company, for another opinion as to whether the medical documentation supported the existence of functional impairments that would preclude plaintiff from performing the duties of his job. After review, plaintiff was notified by letter dated April 27, 2005, that the original denial of his claim was upheld.

On October 20, 2005, Box appealed MetLife's denial of his appeal to the EMC pursuant to the procedures outlined in the LTD Plan. In support of his appeal, plaintiff submitted several letters from his co-workers who described the effects that plaintiff's condition had on his ability to work. He also submitted a letter from Thomas M. Elliott, a vocational expert, the same March 24, 2005, letter from Dr. Boorgu presented earlier, and a decision from the Social Security Administration granting him social security benefits.

In his letter, Mr. Elliott reported that Mr. Box was seen by him on October 6, 2005.  The procedures employed included a clinical interview, review of material provided, which included medical records and reports from Dr. Boorgu, GATB results from the Easter Seals Rehabilitation Center of June 22, 2005, the decision of the Social Security Administration granting Box social security disability payments, vocational analysis and the administration of the Wide Range Achievement Test, Third Edition.

In his report, Mr. Elliott noted that Box drove himself to the interview and that he was unaccompanied.  Elliott then recited plaintiff's educational and work history. Based on the description of his work activities, Elliott stated that he believed that his occupation was best described within the Directory of Occupational Titles as Manager, Circulation (*i.e.*, circulation manager).  Based on this, Elliott made various assumptions on the strength demands of Box's job, including sitting five to six hours of an eight-hour day, standing/walking two to three hours, and having normal near vision.   It also involved directing people, performing varied tasks and using judgment.  He also recited Box's description of his symptoms and the fact that Dr. Boorgu diagnosed Box with Gitelman's syndrome.  (*Id.* at D 40-42).

Elliott then noted that he administered the Wide Range Achievement Test, Third Edition, and that, on the reading portion, plaintiff obtained a score of 108, which fell within the high average range.  The results of the GATB reflected that Box had a "G" score of 119, which meant that Box was considered to be functioning

within the uppermost limits of the high average to bright normal range.  (*Id.* at D 143).

In his summary, Elliott noted that Box obtained a BS Degree in Business Administration in 1986 and that he read well above the 12th grade level.  Elliott also stated that Box told him that he was attempting to complete an on-line course through his home computer in elemental computer operations, but that he was having considerable difficulty with completion.  Box also told him that he had to lie down frequently during the day, generally for 45 minutes every other hour, and that Dr. Boorgu stated that Box was unable to work eight hours a day, five days a week.  Based on this, Elliott opined that Box was considered unable to perform the requirements of any job for which he is or could become qualified.  (*Id.*).

Aside from the tests referenced above, Elliott performed no other testing on plaintiff.  He did no independent tests regarding Box's range of motion, or other physical limitations, nor did he confirm for himself plaintiff's self-described difficulties in completing tasks or in sitting for any extended period of time.

Upon receipt of plaintiff's appeal, the EMC requested that Box submit to an independent medical examination.  This occurred on November 20, 2005, by Dr. Bruce W. Romero, a physician board certified in Internal Medicine and a certified Independent Medical Examiner.

Based upon his review of the administrative record and his own examination of plaintiff, Dr. Romero found that Box suffered from chronic recurrent hypokalemia

and hypomagnesemia consistent with Gitelman's syndrome which was currently controlled, with imbalances corrected by potassium and magnesium replacement. Dr. Romero further noted that symptoms attributable to Gitelman's syndrome resolve upon correction of electrolyte imbalances. Since Box's imbalances had been corrected, he stated that plaintiff's current complaints were without objectively identifiable etiology. Likewise, he found that plaintiff's right flank pain was without objectively identifiable etiology. He concluded that plaintiff had "no objectively demonstrable impairments to prevent him from fulfilling his duties as circulation manager." (*Id.* at D 183).

This report was sent to counsel for plaintiff. The report and the entire administrative record were sent to mcmc LLC, a third-party medical review company, for another opinion as to whether plaintiff was disabled under the terms of the LTD Plan. (*Id.* at D 193-98). Dr. Jacqueline Hess, a physician board certified in Internal Preventive and Occupational Medicine and a Diplomat for the American Board of Internal Medicine, reviewed the administrative record. (*Id.* at D 195). After a review of the administrative file, Dr. Hess concluded that plaintiff was not disabled. (*Id.* at 193).

Thereafter, Elena Ivanova presented a summary of the administrative file by memo to the EMC. The entire administrative file was also provided to the members of the EMC for their review. (*Id.* at D 31). She advised them that her memo was only a summary of the administrative file and that they were "required to independently

review each of the documents in the file and carefully consider the merits of the employee's and his treating medical providers' positions, including any discrepancies or inconsistencies in the evidence." The reviewers also were instructed to "ensure that all information in the administrative file was considered by mcmc in making its determination, and that its conclusion is supported by the documents in the administrative record." (*Id.*). After receiving these instructions, the EMC considered and denied plaintiff's claim.

## ERISA Standard of Review

A district court is to apply *de novo* review to an ERISA plan administrator's decision to deny benefits, "unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility or to construe the terms of the plan." *Hunt v. Hawthorne Assocs., Inc.*, 119 F.3d 888, 912 (11th Cir. 1997) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989)). Where, however, the plan administrator has such discretionary authority, an arbitrary and capricious standard of review is appropriate. *Id*. "To trigger [the arbitrary and capricious] standard of review, the language conferring discretion on the administrator must be express language unambiguous in its design." *Id*. (internal quotation omitted).

In cases in which the plan administrator also funds the plan, the Eleventh Circuit has held that a conflict of interest exists prompting review under a

"heightened arbitrary and capricious" standard.  *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1135 (11th Cir. 2004).

In *Williams*, the Eleventh Circuit recapitulated the approach it set out in *HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co.*, 240 F.3d 982 (11th Cir. 2001), to be used by district courts in determining whether to uphold an administrator's decision to deny benefits to a claimant:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits denial decision is "wrong" (*i.e.*, the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

> (4)  If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

> (5)  If there is no conflict, then end the inquiry and affirm the decision.

> (6)  If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams*, 373 F.3d at 1138 (footnotes and citations omitted).  For purposes of the heightened arbitrary and capricious standard, a conflict of interest exists when a provider has to pay benefit claims out of its own assets, making it directly advantageous to the provider for the claims to be denied.  *Gilley v. Monsanto Co., Inc.*, 490 F.3d 848, 856 (11th Cir. 2007).

### *De Novo* Review

Under the standard set out in *Williams*, the court first must determine whether the decision of the administrator to deny benefits to the plaintiff is *de novo* "wrong."  A decision is "wrong" when the court disagrees with it.  *See Williams*, 373 F.3d at 1138.  There is no dispute that Mr. Box suffers from Gitelman's syndrome.  However, this fact is not dispositive of the matter.  For instance, plaintiff's own physician, Dr. Boorgu, states in his examination notes that plaintiff's hypokalemia is doing "reasonably well."

However, plaintiff asserts that the administrator's determination is wrong because it is contrary to two letters from Dr. Boorgu.  In the first, dated March 24, 2005, Dr. Boorgu does not state that Box is totally disabled but does advise that his Gitelman's syndrome is causing him to suffer several debilitating effects, including maintaining concentration, making management decisions difficult; flank pain, limiting his capacity to sit for extended periods of time; severe fatigue, limiting his capacity to function as a leader; and a limitation on his ability to lift weight to 25

pounds or less, necessary to avoid significant flank pain.  Dr. Boorgu also stated that high stress conditions would exacerbate his fatigue and weakness.  (Plaintiff's Ex. 1 at D 056, Letter from Dr. Boorgu dated March 24, 2005).

Plaintiff also directs the court's attention to another letter.  Dr. Boorgu responded to questions regarding Box's medical condition contained in a letter from attorney Robert Bunch dated June 9, 2005, and designed to elicit "yes" or "no" responses.  Dr. Boorgu check-marked "yes" in response to each of three questions regarding plaintiff's medical condition:

> 1.   In your medical opinion does Mr. Box suffer from chronic hypokalemia, depression, anxiety, gastroesophageal reflux disease and Gitelman's syndrome?
>
> 2.  In your medical opinion, is Mr. Box's Gitelman's disease such that it is debilitating and causes chronic wasting of electrolytes?
>
> 3.  In Mr. Box's case, is Gitelman's syndrome a lifelong disease that precludes him from work involving sitting, standing and walking for an 8-hour workday, 5 days a week on a regular and continuing basis?

(*Id.* at D 061-62, Letter from Robert Bunch dated June 5, 2005).

Plaintiff also points to statements he submitted from two co-workers who described Box's inability to work based on their own observations.  (*Id.* at D 57, D 60).  He also notes that the vocational report which he submitted states that he is unable to perform the requirements of past work or any job for which he is or could become qualified by education, training, or work experience.  (*Id.* at D 39-43, Letter

from Thomas Elliot dated October 7, 2005).  According to plaintiff, further evidence of his disability is found in the fact that he was determined to be eligible for Social Security disability benefits.

Defendant disputes Box's claim of disability.  Although defendant asserts that Dr. Boorgu's own notes contradict his letter of March 24, 2005, and his responses to the letter of June 5, 2005, these same records reflect that plaintiff was suffering from a variety of symptoms that waxed and waned in their severity.

In support of its contention that Box is not entitled to disability, defendant claims that Dr. Boorgu's opinion regarding Box's disability is inconsistent with the medical records of his examinations of Box.  In the first instance, it takes issue with the letters from Dr. Boorgu, asserting that his own records do not support his claim that Box is suffering from the symptoms cited in his March 24, 2005, letter referenced above.  As support for this assertion, defendant points to some of Box's visits to Dr. Boorgu in which the physician states in his notes that Box was "doing reasonably well."

Dr. Boorgu's notes from Box's examination on August 2, 2004, state that Box's potassium level, related to his Gitelman's syndrome, was now "reasonably well controlled on high dose of K[4] supplementation."  (*Id.* at D 135).  His notes of Box's examination on October 21, 2004, also reflect that Box's hypokalemia was "doing

---

[4]  "K" is the Periodic Table symbol for potassium.

reasonably well" with plaintiff "on high dose of K and magnesium." (*Id.* at D 137). Likewise, the notes from these examinations reflect that plaintiff's medical tests were normal. However, these notes also reflect that plaintiff was suffering from "[r]ight flank pain," "significant malaise" and "significant problems with fatigue, muscle cramps and generalized malaise." (*Id.* at D 135, 137).

Defendant also states that it found the vocational report of Thomas Elliott to be unpersuasive because Elliott did not conduct any independent analysis or evaluation of plaintiff. Instead, he based his conclusions on what plaintiff told him about his job duties and functional abilities and Dr. Boorgu's opinion of his condition. The only independent testing done by Elliott was the administration of two intelligence tests which reflected that plaintiff functioned at a very high level.

With regard to the grant of disability status under the Social Security Act, defendant states that the Social Security Administration (SSA) used a different definition of disability and different criteria for measuring such a disability than the LTD Plan. It notes that the EMC is not bound by the SSA determination.

The Eleventh Circuit has noted that the approval of disability benefits by the Social Security Administration is not dispositive as to whether a claimant satisfies the requirement for disability under an ERISA covered plan. *See Whatley v. CNA Ins. Co.*, 189 F.3d 1310, 1314 n.8 (11th Cir. 1999) (internal citation omitted). However, a district court may consider the Social Security Administration's determination of disability when reviewing a plan administrator's benefit decision. *Id.* (internal

citation and quotation omitted).  In addition, the Supreme Court explained that there are "critical differences between the Social Security disability program and ERISA benefit plans." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832, 123 S.Ct. 1965, 1971, 155 L.Ed.2d 1034 (2003).  "In determining entitlement to Social Security benefits, the adjudicator measures the claimant's condition against a uniform set of federal criteria." *Id.* at 823, 123 S.Ct. at 1966.  Furthermore, unlike the Social Security decision maker, the plan administrator is under no obligation to defer to the treating physician's opinion.  *Id*. at 822-23, 123 S.Ct. at 1966 (rejecting treating physician rule in ERISA cases).

Defendant also considered the fact that another of Box's treating physicians, Dr. Bergman, could not explain why he was exhibiting the symptoms of which he complained and expressed doubt that they were related to Gitelman's syndrome because his potassium level was "adequate" and his physical examination was "essentially normal."

Defendant had Box submit to a physical examination by Dr. Bruce W. Romero, a physician board certified in Internal Medicine and a certified Independent Medical Examiner.   He found that Box suffered from hypokalemia and hypomagnesemia consistent with Gitelman's syndrome but further noted that laboratory testing indicated that the disease was under control.  Dr. Romero further noted that symptoms attributable to Gitelman's syndrome resolve upon correction of electrolyte imbalances.  Since Box's imbalances had been corrected, he stated that plaintiff's

current complaints were without objectively identifiable etiology.[5]  He also could find no explanation for the right flank pain.

Dr. Romero's report, along with the rest of the administrative record, was sent to Dr. Jacqueline Hess, a physician board certified in Internal Preventive and Occupational Medicine and a Diplomat for the American Board of Internal Medicine, who reviewed the administrative record.  After reviewing the entire administrative record, Dr. Hess concluded that while there were self-reported complaints of fatigue, there was no objective functional loss documented.  She, too, concluded that plaintiff was not disabled.

After a review of all the records and other evidence submitted by the parties, the court cannot conclude that the decision of the plan administrator was wrong.  The evidence is clear that plaintiff's hypokalemia is under control with the medication he has been prescribed.  Dr. Boorgu's own records support this conclusion, despite his letters to the contrary.  No one doubts that plaintiff suffers from Gitelman's syndrome and that its effects can be debilitating.  However, the objective medical evidence conclusively demonstrates that the hypokalemia associated with Gitelman's syndrome is well under control.  Likewise, all of plaintiff's other medical tests are normal.  He has not been diagnosed as suffering from fibromyalgia; and, in fact, even Dr. Boorgu notes that plaintiff's flank pain has no objective etiology.  In short, despite having

---

[5] Despite plaintiff's contention to the contrary, a plain reading of Dr. Romero's report makes it clear that this is what he means.

been examined by numerous physicians, there is nothing to support plaintiff's claim that he is disabled other than his assertion of subjective symptoms.  Under these circumstances, the court cannot and does not conclude that the decision to deny plaintiff benefits for total disability was wrong.

## Arbitrary and Capricious Review

Even assuming that the decision of the plan administrator was wrong, it was, nonetheless, reasonable.  There is ample medical evidence to conclude that plaintiff suffers from no objective symptoms which would support a finding that he is totally disabled.

Plaintiff asserts that the administrator acted unreasonably when it denied his disability claim based on a lack of objectively identifiable proof of disability.  Plaintiff further asserts that the actions of the EMC were unreasonable because Robert Nusspickel, Director of Corporate Benefits, testified that he was present when the EMC voted to deny plaintiff's claim and he did not recall any discussion regarding plaintiff's job duties, or the determination of disability by the SSA, or that plaintiff's vocational report reflected that he was totally disabled.  He also asserts that the memorandum from lawyer Elena Ivanova of the Times legal department to the EMC failed to mention any information favorable to plaintiff.

Defendant responds by noting that Nusspickel was not a member of the EMC and did not vote on plaintiff's appeal.  His role at the meeting was simply to answer

questions the EMC members may have had about the LTD Plan. (Nusspickel Depo. at 5-6, 18). Thus, his knowledge, or lack thereof, regarding plaintiff's condition was irrelevant. The fact that the members did not discuss the favorable information submitted by plaintiff in Nusspickel's presence does not mean that they were not aware of it and did not review it prior to when they met to vote on plaintiff's appeal.

On the contrary, prior to the meeting, Ivanova presented a memo to the EMC containing what she described as a factual and procedural background on the case. While her memo failed to include an outline of any of the evidence favorable to plaintiff, she advised the Committee members that her memo was only a summary of the administrative file and that they were required to independently review each of the documents in the file and "carefully consider the merits of the employee's and his treating medical providers' positions, including any discrepancies or inconsistencies in the evidence." (Plaintiff's Ex. 1 at D 30-31, Memo to EMC from Elena Ivanova). She further advised that the EMC members were free to accept or reject any prior determination in the case and should afford no deference to any prior determination in rendering a decision. (*Id.*).

Thus, even though the factual synopsis provided by Ivanova was not a paragon of evenhandedness, it sufficiently apprised the EMC members that they had a duty to review all of the information contained in the file, including information favorable to plaintiff, before rendering a decision. Thus, these facts do not demonstrate that plaintiff's favorable evidence was either ignored or brushed aside.

Plaintiff also asserts that the decision of defendant is arbitrary and capricious because Dr. Romero and Dr. Hess found him not to be disabled due to the fact that there was no objective evidence that he was suffering from any disability. He states that it was unreasonable for the administrator to require objective proof of something that cannot be measured by objective tests, such as pain and fatigue.

Plaintiff's claim has some support, at least with regard to claims based on disabilities caused by illnesses such as fibromyalgia. *See, e.g., Oliver v. Coca Cola Co.*, 497 F.2d 1181, 1196-97 (11th Cir. 2007); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914 (7th Cir. 2003); *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3d Cir. 1997). Fibromyalgia is a disease for which the principal symptoms are "pain all over," fatigue, disturbed sleep and stiffness. Its symptoms are entirely subjective. *Hawkins*, 326 F.3d at 315.

However, plaintiff has not been diagnosed as suffering from fibromyalgia. He has been diagnosed with Gitelman's syndrome, which carries objective indicators such as inordinately low levels of potassium and low magnesium in the body. When present, this disease can lead to the symptoms complained of by plaintiff and there is no doubt that he does, in fact, suffer from this disease. Early tests showed that he suffered from low levels of potassium, and the conclusion that this was caused by Gitelman's syndrome has not been disputed by either party. Thus, unlike fibromyalgia, there is objective evidence, based on laboratory tests, to indicate the

presence of Gitelman's syndrome in a patient. Plaintiff had, but no longer has, these symptoms; *i.e.*, low potassium and magnesium.

The problem for plaintiff is that, according to Dr. Romero, the symptoms of Gitelman's syndrome, such as pain and fatigue, resolve when the patient's levels of potassium and magnesium are brought back to a normal level. The most recent tests performed on the patient reflect that the potassium supplements he has been taking have caused his potassium level to return to a level where he was described by his own physician as doing "reasonably well."

Although Dr. Boorgu concluded that plaintiff suffered from fatigue and pain as a result of Gitelman's syndrome, Dr. Romero and Dr. Hess state that, based on his current level of potassium as now reflected in laboratory tests and given that his physical examination was otherwise essentially normal, there is no objective evidence that he is suffering from anything that would cause these symptoms to exist. Therefore, they concluded that he is not disabled.

Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. However, courts cannot require administrators automatically to accord special weight to the opinions of a claimant's physician, nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation. *Black & Decker Disability Plan v. Nord*, 538 U.S. at 843, 123 S.Ct. at 1972. In this case, given that plaintiff no longer suffered from the depletion

of his potassium level and no other explanation for his claim of pain and fatigue, it was reasonable and not arbitrary and capricious for the administrator to rely on the opinions of Dr. Romero and Dr. Hess over that of Dr. Boorgu.

## Heightened Arbitrary and Capricious Review

If the initial decision of the plan administrator were wrong, then it is not sufficient to demonstrate that the decision of the administrator was not arbitrary and capricious if the administrator is laboring under a conflict of interest.  In such a situation, the heightened arbitrary and capricious standard is applied.

For purposes of the heightened arbitrary and capricious standard, a conflict of interest exists when a provider has to pay benefit claims out of its own assets, making it directly advantageous to the provider for the claims to be denied.  *Gilley*, 490 F.3d at 856.  In *Williams, supra*, the Eleventh Circuit stated:

> In most cases where a company both administers and funds a plan, a conflict of interest arises, thus triggering heightened arbitrary and capricious review.  *See Brown v. Blue Cross and Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1562 (11th Cir. 1990); *Yochum v. Barnett Banks, Inc. Severance Pay Plan*, 234 F.3d 541, 544 (11th Cir. 2000); *Levinson v. Reliance Standard Ins. Co.*, 245 F.3d 1321, 1325-26 (11th Cir. 2001) (Where administrator of benefits plan governed by ERISA pays out to participants out of its own assets, a conflict of interest exists between its fiduciary rule and its profit-making role, and accordingly, a heightened arbitrary and capricious standard applies in reviewing administrator's discretionary denial of benefits under the plan).

373 F.3d at 1135.

Long term disability benefits under The Times LTD Plan are paid to eligible participants from the general assets of The New York Times Company. These benefits were, until about two years prior to the deposition of Robert Nusspickel on December 8, 2005, paid from a trust funded by contributions from The New York Times Company. The New York Times had unlimited liability to pay benefits under the Plan regardless of whether the trust held sufficient funds. (Nusspickel Depo. at 10-12). After the use of the trust ended, disability benefits were paid directly from the general assets of The New York Times. (*Id.* at 11).

All of the members of the EMC which considered plaintiff's final appeal were employees of The New York Times. They included the Vice President (VP) corporate controller, VP of compensation and benefits, VP treasurer, VP of human resources for The New York Times, VP of human resources for the broadcast group, President and Chief Executive Officer of the regional newspaper group, the general counsel/secretary for the company, and the director of benefits for the Boston Globe. (*Id*. at 8-9).

In *Williams*, the Eleventh Circuit noted that it is the fact that the employer holds the ultimate power to do with claims as it wants that creates the conflict of interest, not whether it actually does so. *Williams*, 373 F.3d at 1136. The obvious conclusion is that the final decision-maker in this case, the EMC, was, in fact, laboring under a conflict of interest.

However, defendant asserts that it can overcome this fact and demonstrate that the decision in this case was not affected in any way by the conflict of interest. According to Robert Nusspickel, while EMC members may have an interest in the financial performance of The Times, whether they decide to grant or deny benefits has virtually no impact on that performance.  (Nusspickel Aff. at ¶ 4-5).  The Times generates approximately $3.4 billion a year in revenue.  (*Id.* at ¶ 5).  In 2004, benefits paid under the LTD Plan totaled $2,273,413.35, and in 2005 they totaled $2,428,969.25.  In 2006, they totaled $2,374,455.94.  (*Id.* at ¶ 4).  Thus, according to Nusspickel, the benefits paid under the LTD Plan constitute between .0669% and .0714% of the overall revenue of the company.  (*Id.* at ¶ 5).

Defendant asserts that the small fraction of a percentage which the LTD Plan benefits comprise of the overall revenue of The Times renders such benefits immaterial to the financial performance of The Times.  According to defendant, a decision to grant benefits by the EMC has no bearing on the financial outlook of The Times.  Thus, it asserts that to deem the EMC members possess a conflict of interest simply because The Times funds the LTD Plan ignores the financial realities of the situation.

Statistics provided by defendant reflect that since plaintiff left his employment with The Times in 2004, there have been 17 second level reviews of claims for benefits.  Of those 17, 11 of 14 (three were still pending at the time of Nusspickel's

deposition), or 78.5%, were reversed by the EMC and benefits were granted. (Nusspickel Aff. at ¶ 3).

Plaintiff counters that the self-interest of the EMC is reflected by the fact that it employed no vocational expert to determine what Box's occupation required nor conducted any analysis of the medical findings to allow it to determine whether plaintiff was disabled based on his "own occupation."  Plaintiff also asserts that the EMC had no one with any expertise in the medical or vocational field, and the process of his appeal reflects that the Committee members never had any discussion about his occupation, his illness or its effects.  Likewise, there was no discussion regarding the fact that he received a favorable decision regarding his application for Social Security disability benefits or the conclusions of Dr. Boorgu.

Plaintiff also asserts that the fact that the EMC granted 11 of 14 second level appeals is irrelevant because defendant provided no information during discovery of this fact or of the basis for the other appeals, including whether any of these cases possessed any similarities to plaintiff's case.

Plaintiff also notes that the "revenue" of The New York Times may be large, but defendant provided no information regarding costs that would offset revenue, which also could be large.  No evidence of this was provided by defendant.  Plaintiff also notes that The New York Times 2005 annual 10K statement (a public record) reports its net income as $259,753,667.  This is a large sum, but considerably less than $3.4 billion.  Likewise, this report contains a statement by The New York Times

that it is taking steps to lower expenses by reducing staff and employee benefits. (Plaintiff's Ex. 6-A, The New York Times 10K Report for 2005).

Since the administrator, the EMC, was acting under a conflict of interest, "the burden shifts to the [administrator] to prove that its interpretation of the plan provisions committed to its discretion was not tainted by self interest." *Brown v. Blue Cross & Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1566 (11th Cir. 1990), *cert. denied*, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991). Just exactly how that is to be accomplished has not yet been fully addressed by the Eleventh Circuit.

One method used by the Eleventh Circuit is the burden shifting approach as specified in *Brown*, which requires the plan administrator to "purge the taint of self-interest" by producing evidence that its determinations benefited the class of plan participants or represented a uniform construction of the Plan. 898 F.2d at 1568. However, that case dealt with an issue regarding plan interpretation rather than a factual dispute. Obviously, interpreting a section of an ERISA plan may be inappropriate if it has a negative effect on an insured, especially where there is more than one reasonable interpretation and the plan administrator suffers from a conflict of interest. In that situation, the Eleventh Circuit in *Brown* stated that the taint of self-interest could be purged only by evidence that the unfavorable interpretation nonetheless benefited plan participants as a whole or was consistent or "uniform" construction of the plan. Unfortunately, this test is rather unwieldy when applied to

a case that turns on a determination of the facts by the administrator, rather than an

interpretation of the terms of the plan itself.  As one court has stated:

> In a heavily fact-laden inquiry such as this, as opposed to
> a pure question of plan interpretation, the adverse effect of
> a claims administrator's decision on the class of
> beneficiaries and participants is circumscribed by the facts
> of the claim before the administrator.  In contrast, when a
> claims administrator bases its decision on plan
> interpretation, its decision establishes what the plan means
> for all beneficiaries or participants, regardless of the
> particular facts of their case.  Thus, a "contextually
> tailored" modification of the arbitrary and capricious
> standard should reflect the narrow impact of the claims
> administrator's fact-based denial of a single claim *vis-a-vis*
> its plan interpretation.

*Barchus v. Hartford Life and Acc. Ins. Co.*, 320 F.Supp.2d 1266, 1289 (M.D.Fla.

2004).  In order to reach a decision using the heightened arbitrary and capricious

standard, the court in *Barchus* stated that it would apply *Brown*, but "adjust the

burden-shifting analysis to reflect the dynamics of a fact-intensive decision making

process." *Id.* at 1290.  In so doing, the court reached its final decision based on the

following considerations:

> [T]he Court recognizes several facets militating against a
> finding that the Defendant acted to advance its own interest
> rather than base its decision on the facts of the case.  The
> amount reserved by the Defendant for the Plaintiff's claim
> (over $122,000.00) is slight when compared to the size of
> the Defendant's financial position.  Further, as discussed
> above, the potential adverse effect of the Defendant's
> fact-based decision on the class of all plan participants and
> beneficiaries is also minimal.  Moreover, the Court agrees
> that plan participants and beneficiaries benefit by lower
> premiums when the Defendant exercises its contractual

right to discontinue paying benefits to claimants who fail
to submit satisfactory proof of continuing disability.
Finally, and importantly, the Defendant's decision is well
supported in the administrative record.  Accordingly, the
Court is satisfied that the Defendant's decision to
discontinue the Plaintiff's disability benefits was not
motivated by the Defendant's own interest, but rather
represents a rational decision based on the merits of the
Plaintiff's case.

*Id.*

Other courts have insisted on a straightforward application of *Brown*, even

when the decision hinges on a factual determination by the administrator.  *See, e.g.,*

*Burt v. Metropolitan Life Ins. Co.*, 2005 WL 4712457, *13-14 (N.D.Ga. 2005)

(applying *Brown* to both legal and factual determinations).   However, such an

application simply does not make sense when performed in a case that turns on a

determination of facts and not on an interpretation of the terms of the policy.

In *Wise v. Hartford Life and Acc. Ins. Co.*, 360 F.Supp.2d 1310 (N.D.Ga.

2005), the District Court for the Northern District of Georgia addressed this dilemma

and suggested the following solution:

As the foregoing analysis demonstrates, neither
Hartford nor Plaintiff is entitled to judgment as a matter of
law under the first two prongs of the heightened arbitrary
and capricious analysis.  That the administrator's decision
was both reasonable and (for purposes of summary
judgment) "wrong," however, does not necessarily
foreclose the entry of summary judgment, even in cases
where the dispute between the parties is one of fact, rather
than plan construction.  *See Barchus v. Hartford Life &
Accident Ins. Co.*, 320 F.Supp.2d 1266, 1290 (M.D.Fla.
2004) (granting summary judgment to administrator under

heightened arbitrary and capricious review, notwithstanding assumption that the administrator's decision was "wrong" and conclusion that the decision was "reasonable"); *cf. also Fick v. Metro. Life Ins. Co.*, 347 F.Supp.2d 1271, 1286-87 (S.D.Fla. 2004) (although concluding insurer was entitled to summary judgment on grounds decision was not "wrong," went on to state that insurer would likewise be entitled to summary judgment were the case to be analyzed under third prong of heightened arbitrary and capricious analysis).

As the discussion *supra* demonstrates, however, the standard against which the record must be measured in deciding whether summary judgment is proper at this stage of the heightened arbitrary and capricious review remains amorphous. The Eleventh Circuit in *Williams*, because it was unnecessary to dispose of the case before it, elected to "leave the issue to another day," and did not speak to whether the precise burden-shifting approach adopted in *Brown* could be applied in cases involving disputed factual determinations. *Williams*, 373 F.3d at 1139. That the Circuit even raised the issue, which had appeared (either explicitly or by implication) settled by its decisions in *Torres, Shaw* and *Levinson v. Reliance Standard Ins. Co.*, 245 F.3d 1321 (11th Cir. 2001), suggests to this Court that the *Williams* panel saw fit to modify *Brown's* burden-shifting approach in this context.

The inherent stumbling block in a strict application of the *Brown* "test" to cases such as this appears to be that the denial of benefits with respect to one plan participant always increases the reserves out of which other participants may receive payments, thus providing a constant altruistic "justification" for the insurer's denial of the claim *vis-a-vis* the beneficiaries of the plan. Nevertheless, where, as here, the administrator suffers from a "strong conflict" in that it must pay the claim out of its own funds, *see Brown*, 898 F.2d at 1562, that "justification" is likewise invariably self-serving, providing the very foundation of the "heightened" level of arbitrary and capricious scrutiny to be applied.

Page 35 of 41

Literal application of the rule announced in *Brown*– *i.e.*, that "a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries"– consequently becomes hopelessly awkward in this context.  In the event the insurer's preservation of funds through denial of a claim is held to constitute a viable "justification" in that it "benefit[s] . . . the class of all participants and beneficiaries[,]" then the "heightened" arbitrary and capricious standard becomes nothing more than a "reasonableness" test – or, more aptly put, the same arbitrary and capricious standard the court in *Brown* found inappropriate to apply to conflicted ERISA fiduciaries. Alternatively, if it is held not to provide such a justification, then it is difficult to conceive exactly what evidence a plan administrator could proffer to meet its burden under *Brown* – the result being that a wrong but reasonable determination would almost invariably fail to insulate the administrator from liability.  Under that view, the parties would effectively be using a standard akin to the *de novo* review that *Brown* likewise found undesirable in the context of evaluating the decision of conflicted plan administrators ostensibly vested with "discretion" to interpret and apply an ERISA plan.

But just as the *Brown* standard may seem awkward in the context of a challenge to the factual determinations reached by a conflicted plan administrator, an alternative standard does not readily present itself.  As the Circuit observed in *Williams*, it is difficult to formulate a standard of scrutiny that requires an administrator to demonstrate something more than the "reasonableness" of its factual determination, but less than the correctness of it (*i.e.*, that it is not "wrong"), before it may prevail.  *See Williams*, 373 F.3d at 1138 ("We described 'heightened arbitrary and capricious review' *supra* as somewhere between the *de novo* and 'mere' arbitrary and capricious standards.  But where is that 'somewhere'?")  Decisions by the district

courts within this Circuit have likewise reflected frustration in the attempt to craft such a standard. *See, e.g., Barchus*, 320 F.Supp.2d at 1289 n.130.

Forced to attempt to articulate such a standard here, however, this Court concludes that the *Brown* decision itself alluded to the best intermediate standard against which to measure a conflicted administrator's disputed factual determination. In particular, the Circuit Court in *Brown*, briefly considering an isolated factual challenge to the insurance company's decision, stated: "Even a self-interested fiduciary is entitled to choose an apparently more reliable source of information when sources conflict." *Brown*, 898 F.2d at 1568.

In the view of this Court, a comparative, objective analysis respecting the reliability of the various sources before the administrator at the time it made the disputed decision provides a focal point for the court's review that places upon the conflicted administrator a greater burden than merely showing that its decision was not without some reasonable basis, but at the same time, does not demand that the Court actually agree with the decision before it is given deference. Such a standard, moreover, seems consistent with the results reached by other district courts in this Circuit when engaging in the heightened arbitrary and capricious review *vis-a-vis* factual decisions that were presumed to be wrong but reasonable. *See Barchus*, 320 F.Supp.2d at 1290 (in reaching conclusion that insurer was entitled to summary judgment on third prong of heightened arbitrary and capricious review, the court emphasized that the decision to terminate benefits was "well supported in the administrative record"); *see also Fick*, 347 F.Supp.2d at 1286-87 (S.D.Fla. 2004) (concluding that insurer would be entitled to summary judgment regarding (assumed) wrong but reasonable decision, noting, *inter alia*, reliability of sources before administrator).

Accordingly, the Court concludes that a conflicted plan administrator may carry its burden in a suit

challenging a "wrong but reasonable" factual determination if it can demonstrate that the opinions and evidence it relied on denying the plaintiff's claim were, viewed both from a qualitative and quantitative perspective, at least as objectively reliable as the countervailing opinions and evidence then before it. By demonstrating that it chose to follow what it reasonably perceived as equally or more objectively reliable data, the insurer substantially ameliorates any fears that its decision was motivated by self-interest rather than by a good faith effort to exercise its discretion to interpret and apply the plan. Should the administrator meet this burden, the plaintiff can then prevail only if he demonstrates that the decision was arbitrary and capricious by "other measures." *Cf. HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 995 (11th Cir. 2001) (under heightened arbitrary and capricious analysis involving plan interpretation, in the event that insurer carries burden under third prong of *Brown*, "the claimant may still be successful if he can show by other measures that the administrator's decision was arbitrary and capricious.").

*Id.* at 1321-23.

With regard to the facts presented in this case, the court concludes that while the relative financial impact of granting disability claims and the high rate of reversal of denied claims by the EMC is not relevant to whether a conflict of interest exists, it is relevant to the administrator's duty to prove its interpretation of the LTD Plan was not tainted by self-interest. It is also relevant that defendant relied on substantial medical evidence to reach its decision by requiring plaintiff to undergo an independent medical examination and submitting those results to yet another physician for review. *See Fick, supra*, 347 F.Supp.2d at 1286. Furthermore, "[e]ven a self-interested fiduciary is entitled to choose an apparently more reliable source of

information when sources conflict." *Brown*, 898 F.2d at 1568.  Thus, simply because defendant decided against granting disability status to plaintiff based on the opinions of Dr. Romero and Dr. Hess over those of Dr. Boorgu and plaintiff's vocational expert does not require the automatic conclusion that its decision was tainted by self-interest.

However, as plaintiff points out, much of the information put forth by defendant regarding the financial stability of The New York Times was not provided to plaintiff during discovery and was not subject to a true vetting.  Furthermore, the information provided does not reflect the true financial stability of The Times or the effect of disability claims on its net financial stability.  Plaintiff has shown that The Times is concerned about costs associated with employee benefits.

However, even based on net profit, the amount of money spent by The Times in paying out *all* disability claims benefits is still only about one percent.  In addition, although it is true that The Times did not employ a vocational specialist to determine if there were any jobs plaintiff could perform, plaintiff did employ such a specialist and, yet, inexplicably failed to have him do this.

Likewise, there is no information before the court regarding the 11 disability claims that were granted by the EMC, or the three that were not.  However, that is not the point.  What is important is that the EMC was clearly willing to make decisions that were not in the economic interest of The Times.  This is strong evidence that its decisions are not affected by the conflict of interest.

Thus, the court concludes that the amount that would need to be reserved by defendant for plaintiff's claim is slight when compared to the size of defendant's financial position.  Further, the potential adverse effect of defendant's fact-based decision on the class of all plan participants and beneficiaries is also minimal. Finally, and importantly, defendant's decision is well supported in the administrative record.

Furthermore, the record demonstrates that the opinions and evidence defendant relied on in denying plaintiff's claim were, viewed both from a qualitative and quantitative perspective, at least as objectively reliable as the countervailing opinions and evidence then before it.  By demonstrating that it chose to follow what it reasonably perceived as equally or more objectively reliable data, defendant has substantially ameliorated any fears that its decision was motivated by self-interest rather than by a good faith effort to exercise its discretion to interpret and apply the plan.

Therefore, using the methodology put forth in either *Barchus* or *Wise*, the court concludes that defendant has demonstrated that its decision to deny LTD benefits to plaintiff was not arbitrary and capricious and was not the result of the above-noted conflict of interest, but instead was a rational decision based on the merits of plaintiff's case.  Therefore, defendant's motion for summary judgment is due to be granted and plaintiff's motion for summary judgment is due to be denied.  A separate

order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this 4th day of December, 2007.

_____
HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE